# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

Case No. 18-cv-01830-DDD-MEH

OMNIMAX INTERNATIONAL, INC.,

    Plaintiff-Counterclaim Defendant,

v.

ANLIN INDUSTRIES, INC.,
JOHN APPLEGATE,
MARIE CLARK,
PATRICIA MOLINE,

    Defendants-Counterclaim Plaintiffs.

## ORDER

Plaintiff—a manufacturer and distributor of metal and vinyl products, including replacement windows and doors—brought this case against three of its former sales representatives and the competitor that hired them, seeking damages and injunctive relief for alleged breach of contract, misappropriation of trade secrets, defamation, and related harms. Defendants filed four counterclaims (Doc. 41), three of which Plaintiff moves to dismiss for failure to state claims under Federal Rule of Civil Procedure 12(b)(6). (Motion, Doc. 44.) For the reasons that follow, the Court **GRANTS** the Motion.

I.  **BACKGROUND**

Plaintiff Amerimax[1] and Defendant Anlin are window vendors that sell to dealers. (Countercl. ¶ 1, Doc. 41.) This case centers on certain customer lists and confidential information that Amerimax alleges it owns but that its former employees misappropriated as they departed Amerimax to work for Anlin. (*See generally* Am. Compl., Doc. 38.) The facts as described below are drawn from the allegations in the counterclaim, which the Court must treat as true when considering a motion to dismiss. *Wilson v. Montano*, 715 F.3d 847, 850 n.1 (10th Cir. 2013) (citing *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011)).

Amerimax publishes a price book for its products, which is widely available and routinely received by dealers. (Countercl. ¶ 3.) However, Amerimax typically charges dealers less than the price published in the book—at a discount that varies per dealer based on a "Base Factor" and "Options Factor"—pursuant to an industry standard practice. (*Id.*) Dealers are not required to keep their individualized pricing confidential and regularly disclose such information in negotiations with competitors of Amerimax. (*Id.* ¶ 4.) Amerimax maintains a spreadsheet of the Base Factors for all its customers, which it calls the "Master Pricing List." (*Id.* ¶ 5.)

In October 2003, Amerimax hired Defendant Marie Clark, who worked as a sales representative for the company with territory in Colorado, Wyoming, and

---

[1] Plaintiff OmniMax International, Inc., formerly known as Euramax International, Inc., has an operating and manufacturing division called "Amerimax," which is at issue in this dispute. For ease of reference in the present Order, the Court will refer to Amerimax in place of either OmniMax or Euramax.

Nebraska. (*Id.* ¶ 21.) In July 2006, Amerimax hired Defendant John Applegate, who worked as a sales representative with territory in Colorado, New Mexico, and Texas. (*Id.* ¶ 6.) Neither had any supervisory responsibilities. (*Id.* ¶¶ 8, 23.) In May 2016, Amerimax sent Applegate and Clark an e-mail with the subject "Restrictive Covenant Agreement," stating that "effective immediately . . . [e]mployees who are eligible for any bonus or incentive must sign the agreement on an annual basis. Employees who fail to do so will not be paid any bonus or incentive payment." Amerimax sent a follow-up e-mail a few days later stating that "[i]n order for Q1 SIP bonuses to be processed and paid – these [agreements] need to be turned in today." (*Id.* ¶¶ 11, 26 ("Agreements").) Both Applegate and Clark were eligible for bonuses and signed the documents, but currently insist that none of the information to which they had access during their time with the company was ever identified as confidential or secret. (*Id.* ¶¶ 13, 27.)

Citing ineffective servicing of customers, compensation and benefits issues, unrealistic sales targets, and (in the case of Clark) offensive offhand remarks, Clark and Applegate eventually provided two weeks' notice and resigned effective May and June 2018, respectively. (*Id.* ¶¶ 16, 18, 27, 30.) Shortly after their departures, both went to work for Anlin. (*Id.* ¶¶ 17, 31.) On June 25, 2018, Anlin mailed an announcement to many window contractors, including Amerimax customers, advertising Clark's new affiliation with Anlin. (*Id.* ¶ 32.) On July 2, 2018, Anlin did the same regarding Applegate. (*Id.* ¶18.) Both employees maintain that they did not take the Master Pricing List, memorize it, or use the information contained therein

3

with respect their employment with Anlin. (*Id.* ¶¶ 17, 31.) Neither directly solicited any Amerimax customers or made any disparaging comments concerning their former employer. (*Id.* ¶¶ 19–20, 33–34.)

In September 2009, Amerimax hired Defendant Patricia Moline as a customer service representative to handle incoming orders and inquiries. (*Id.* ¶ 35.) She does not recall ever being presented with or signing a "Restrictive Covenant Agreement." (*Id.* ¶ 38.) Citing stagnant compensation and decreasing benefits, she left Amerimax in June 2018. (*Id.* ¶¶ 39, 42.) Like Applegate and Clark, she maintains that none of the information to which she was privy at Amerimax was described as secret or confidential, she did not take or use the Master Pricing List, and she has never made any disparaging remarks about her former employer. (*Id.* ¶¶ 39, 43.)

Amerimax brought this action for damages and injunctive relief against Defendants, alleging breaches of non-compete and non-solicitation covenants and related obligations, as well as violations of the Colorado Uniform Trade Secrets Act. Defendants asserted four counterclaims against Amerimax. Count One pursues a declaration under Colo. Rev. Stat. § 8-2-113(1)–(2) that none of the Agreements are enforceable against Applegate, Clark, or Moline. Count Two seeks damages pursuant to the same statute to compensate Applegate and Clark for the alleged threats and intimidation Amerimax employed in causing them to sign the Agreements. Count Three asserts unlawful restraint of trade in violation of Colo. Rev. Stat. § 6-4-104. Count Four claims that Amerimax's filing and prosecution of

4

this case is an abuse of process. The instant Motion seeks dismissal of the latter three of these claims.

## II. ANALYSIS

The legal sufficiency of a pleading is a question of law. *Dubbs v. Head Start, Inc.*, 1194, 1201 (10th Cir. 2003). As noted above, at this stage all allegations of material fact in support of the counterclaims must be accepted as true. *Wilson v. Montano*, 715 F.3d at 850 n.1. Still, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility means that the pleader set forth facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[L]abels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 545.

### A. Count Two: Claim for Damages Under Colo. Rev. Stat. § 8-2-113(1)

Defendants' second claim is for damages they allege were caused by Amerimax's use of "threats and/or intimidation to cause Applegate and Clark to sign" the Agreements. (Countercl. ¶ 54, Doc. 41.) This, they argue, violates Colorado law and entitles them to sue for damages. The statute in question, dubbed "Unlawful to intimidate worker--agreement not to compete," declares it "unlawful to use force, threats, or other means of intimidation to prevent any person from engaging in any lawful occupation at any place he sees fit." Colo Rev. Stat. § 8-2-

5

113(1). It goes on to declare that except for certain contracts, including those for the protection of trade secrets or regarding management personnel and executive staff, "any covenant not to compete . . . shall be void." *Id.* § 8-2-113(2). Applegate and Clark allege that they were damaged by Amerimax's "use[ of] threats and/or intimidation . . . . Specifically, Amerimax threatened Applegate and Clark in emails that unless they signed [a] Restrictive Covenant Agreement, they would not receive bonuses to which they were already entitled." (Countercl. ¶¶ 54–55.) Amerimax responds that even if one assumes its behavior violated the statute, the state legislature did not intend this provision to create a private right of action for damages.

In a diversity case like this one, federal courts seek to ascertain and apply state law and must defer to the decisions of the controlling state's highest court. *Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1295 (10th Cir. 2010). Unfortunately, no party has pointed to any Colorado decision with direct guidance on the question whether a party may seek damages for a statutorily improper threat under Section 113. And the statute itself provides no express authorization for a such a claim. So, the Court must divine whether such authorization should be inferred. In matters of statutory interpretation, Colorado's Supreme Court has declared that a court's "fundamental task must be to discern and effectuate the legislature's intent. When, as here, a claimant alleges that a statute, ordinance, or regulation implicitly creates a private right of action, the critical question is whether the legislature intended such a result." *City of Arvada ex rel. Arvada Police Dep't v. Denver Health & Hosp.*

6

*Auth.*, 403 P.3d 609, 614 (Colo. 2017). This Court is not convinced of the practicality of that intent-based approach to statutory interpretation,[2] but if "no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do." *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1180 (10th Cir. 2007) (internal quotations and citations omitted).

Fortunately, Colorado's Supreme Court has given us more concrete guidance in how it interprets statutory text structure when it comes to allegations of implied rights of action. As an initial matter, "if the legislature includes a remedy in the statute at issue, [Colorado courts] will conclude it did not intend for the courts to create others." *City of Arvada*, 403 P.3d at 614–15 (quoting *Allstate Ins. Co. v. Parfrey*, 830 P.2d 905, 910–11 (Colo. 1992)). But if the statute "is totally silent on the matter of remedy," then the court "must determine whether a private civil remedy reasonably may be implied." This turns on three factors:

> (1) "whether the plaintiff is within the class of persons intended to be benefitted by the legislative enactment";
>
> (2) "whether the legislature intended to create, albeit implicitly, a private right of action"; and
>
> (3) "whether an implied civil remedy would be consistent with the purposes of the legislative scheme."

*Id*. The statute must satisfy all of these for a court to "conclude the legislature clearly expressed its intent to create a cause of action conferring standing on the

---

[2] *See, e.g.*, Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 61, 68 (1994) ("Intent is elusive for a natural person, fictive for a collective body.").

7

claimant." *Id*. Discussing these considerations, *Parfrey* suggests that inferring a right of action may be appropriate when doing so would incentivize compliance and failing to do so would leave the statutorily-intended beneficiary without recourse. *See Parfrey*, 830 P.2d at 911; *City of Arvada*, 403 P.3d at 615.

Applying this framework, the Court holds that Section 113 does not clearly afford the Defendants, under the circumstances presented here, a cause of action for damages. It is worth emphasizing that the Court is not deciding whether there are ever *any* potential circumstances in which a damages action for violation of Section 113 might succeed. But the alleged intimidation here relates entirely to threatening to withhold bonuses if Clark and Applegate did not sign the Agreements. (*See* Countercl. ¶¶ 45, 54–55.) The question before the Court is therefore limited to whether Colorado law provides a right to sue for damages based on such allegations where the employees entered covenants, continued their employment, and received all benefits they were due.

As Amerimax argues, the law at issue is not silent on the matter of remedy. Illegal non-competition covenants are void. Colo Rev. Stat. § 8-2-113(2). Defendants respond by pointing out that not all covenants are illegal, and that the remedy does not cover all prohibited conduct, for example where a facially acceptable covenant (e.g., one purporting to protect trade secrets) is procured by prohibited conduct (e.g., via intimidation). This is so, but it does not alter the fact that in this case, at least, any alleged damage flows from being induced to enter the Agreements. The bonuses in question were ultimately paid, and the threats and intimidation did not, as far as

8

the counterclaim asserts, lead to any damage other than that allegedly caused by the Agreements themselves.

Moreover, the remedy here of avoiding the covenants incentivizes compliance and is consistent with existing state law. This claim is essentially one alleging that the Agreements were signed under duress, and such harms are well-guarded against by Colorado's general principles of contract law. And those principles provide the same remedies: voidability and rescission. *Vail/Arrowhead, Inc. v. Dist. Court for the Fifth Judicial Dist., Eagle Cty.*, 954 P.2d 608, 612 (Colo. 1998) ("A contract is voidable on the grounds of duress if a party's manifestation of assent is induced by an improper threat that leaves no reasonable alternative.") (citing Restatement (Second) of Contracts § 176 (1981)). Absent any authority indicating otherwise, the Court cannot say that the Colorado legislature intended to upend these common, privately accessible equitable principles by tacitly authorizing statutory damages in circumstances where the law has dependably afforded only equitable remedies.

Finally, the language of Section 113(1)—"[t]hat it shall be unlawful to use force, threats, or other means of intimidation to prevent any person from engaging in any lawful occupation"—has been in place for a century, where it once appeared alongside codes prohibiting (and providing criminal penalties for) blacklisting, picketing, and publishing notices of boycott. *See* Colo. Rev. Stat. Ch. XV Sec. 400 (1908) ("Blacklisting and Boycotting"). As historically, there are today criminal penalties in place to discipline (and therefore deter) violations of the provision in

questions. Colo. Rev. Stat. § 8-2-115 ("Any person, firm, or corporation violating any provisions of sections 8-2-112 to 8-2-115 is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not less than ten dollars nor more than two hundred fifty dollars, or by imprisonment in the county jail for not more than sixty days, or by both such fine and imprisonment."). Colorado law, therefore has implemented effective deterrents and remedies in place to enforce the state's longstanding prohibition, but it imbues the state—and not private parties—with armament in non-equitable remedies.

Although the considerations laid out by *Parfrey* involve some overlap, the gravity of available legislative materials, existing criminal penalties, and available equitable remedies—taken together—do not permit the Court to infer that Colorado's "legislature clearly expressed its intent to create a cause of action" for damages under Section 113 in these circumstances. Defendants' second counterclaim therefore must be dismissed.

### B. Claim Three: Antitrust Claim Under Colo. Rev. Stat. § 6-4-104

Under the Colorado Antitrust Act of 1992 ("Act"), "[e]very contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce is illegal." Colo. Rev. Stat. § 6-4-104. At this motion to dismiss stage, the debate is whether Defendants' allegations concerning the Agreements adequately invoke the Act.

As the parties agree, stating a claim under the Act is analogous to one brought under the federal Sherman Act and involves three elements: (1) the

defendant entered into an agreement constituting a contract, combination in the form of a trust or otherwise, or conspiracy; (2) that constitutes an unreasonable restraint on trade; and (3) the plaintiff suffered an antitrust injury. *JTS Choice Enterprises, Inc. v. E.I. DuPont De Nemours & Co.*, No. 11-CV-03143-WJM-KMT, 2014 WL 793525, at *4–*5 (D. Colo. Feb. 26, 2014); *Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, 80 F. Supp. 3d 1257, 1262 (D. Colo. 2015) ("The Colorado Antitrust Act is the state law analogue to the Sherman Act. . . . [T]he courts shall use as a guide interpretations given by the federal courts to comparable federal antitrust laws." (internal citations omitted)).

Assuming for present purposes that Anlin has alleged that the Agreements restrain trade, the Motion focuses on the third element—whether the pleadings sufficiently state an antitrust injury. "An antitrust injury is defined as an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 882 (10th Cir. 1997). The thrust of this analysis is whether a particular practice is "anticompetitive," using that term with special antitrust meaning reflecting the regulations' "basic objectives, the protection of a competitive process that brings to consumers the benefits of lower prices, better products, and more efficient production methods. . . . In this lexicon, a practice ultimately judged anticompetitive is one which harms competition, not a particular competitor." *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994) (internal citations

11

omitted); *see also Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488 (1977) (holding antitrust laws were enacted to protect competition, not competitors).

For many courts, the "crucial first step," "screen," or "filter" dispositive of whether an accused's practices harm competition within the meaning of the antitrust statutes is whether that firm possesses "market power." *SCFC*, 36 F.3d at 963. As the Tenth Circuit explained in *SCFC*, "market power is the ability to raise price by restricting output. '[I]n economic terms [it] is the ability to raise price without a total loss of sales.' Without market power, consumers shop around to find a rival offering a better deal." *Id.* at 965 (quoting 2 P. Areeda & D. Turner, *Antitrust Law* ¶ 501, at 322 (1978)). The Circuit continued by quoting from one of the foremost antitrust authorities in the United States: "if we accept the notion that the point of antitrust is promoting consumer welfare, then it is clear why the concept of market power plays such a prominent role in antitrust analysis. If the structure of the market is such that there is little potential for consumers to be harmed, we need not be especially concerned with how firms behave." *Id.* (quoting George A. Hay, *Market Power in Antitrust,* 60 Antitrust L.J. 807, 808 (1992)).

Here, Anlin has failed to plausibly allege any comprehensible antitrust injury. Its threadbare, singular allegation—that the Agreements have anticompetitive effects because they tend to limit the entry of new companies into the Colorado market—is assumptive, conclusory, not colored by any facts permitting that inference, and ignores wholesale the fundamental principles of consumer protection the antitrust laws were enacted maintain. For example, the threshold

market power query begins with the determination of the relevant market and involves evaluating the geographic reach of the businesses at issue and the type, price, and interchangeability of the products they sell. *Id.* at 966. Aside from a short conclusion that Anlin itself has suffered injury because of the Agreements with three employees, the counterclaims fail to even hypothetically plead facts to inform the Court of the relevant market, the market power of any party, or how the use of the Agreements causes that or any other antitrust injury, such as a negative impact on consumers. In all, Anlin has failed to nudge its allegations of an antitrust injury across the line from conceivable to plausible, *Twombly*, 550 U.S. at 570, and its third counterclaim accordingly fails.

### C. Claim Four: Abuse of Process

The final claim at issue is for abuse of process. In Colorado, abuse of process requires proof of (1) an ulterior purpose in the use of judicial proceedings; (2) willful actions by a defendant in the use of process that are not proper in the regular conduct of a proceeding; and (3) damages. *Hewitt v. Rice*, 154 P.3d 408, 414 (Colo. 2007). "An improper use of the legal process occurs when a particular procedural tool is used in an attempt to accomplish a result which that tool, when properly used, could not provide." *Gustafson v. Am. Family Mut. Ins. Co.*, 901 F. Supp. 2d 1289, 1305 (D. Colo. 2012). "If the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint there is no abuse, even if the plaintiff had an ulterior motive in bringing the action or if he knowingly brought suit upon an unfounded claim." *James H. Moore & Assocs.*

*Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 373 (Colo. App. 1994). And "while the ulterior motive may be inferred from the wrongful use of the process, the wrongful use may not be inferred from the motive." *Id.*; s*ee also* Restatement (Second) of Torts § 682 comment b (1977) ("[T]here is no action for abuse of process when the process is used for the purpose for which it is intended, [although] there is an incidental motive of spite or an ulterior purpose.").

Here, the allegations purporting to state a claim for abuse of process are severely limited. According to the counterclaims, Amerimax had an ulterior purpose in filing this action, which was an attempt to enforce knowingly void non-compete agreements and deter Anlin's right to legitimate competition in Colorado. Even were the Court to assume the truth of that accusation, Defendants have failed to plausibly allege any legal impropriety, and an "ulterior or even nefarious motive, alone, isn't enough to constitute an abuse of process." *Parks v. Edward Dale Parrish LLC*, No. 17CA1257, 2019 WL 470515, at *3 (Colo. App. 2019). Defendants have not sought to test the assertion that Amerimax's claims lack factual or legal support through a motion to dismiss, but even if they did so successfully, "filing a complaint not justified in fact or law alone is not enough to amount to an abuse of process." *GN Netsome, Inc. v. Callpod, Inc.*, No. 11-CV-03271-RBJ, 2012 WL 4086530, at *2 (D. Colo. Sept. 17, 2012) (reviewing Colorado authority). Even if there is an alleged "ulterior motive," there are no allegations showing this action and its procedural tools have been used for anything other than their regular, legitimate judicial

14

functions. Anlin's fourth counterclaim thus does not allege a prima facie case for abuse of process, and accordingly fails.

## III. CONCLUSION

For the foregoing reasons, counterclaims Two, Three, and Four are **DISMISSED** without prejudice. Defendants may proceed on their claim for declaratory relief.

Dated: June 17, 2019.

BY THE COURT:

*/s/ Daniel D. Domenico*
Daniel D. Domenico
United States District Judge